## Richmond.

### TUNE v. FALLIN.

January 29th, 1891.

FRAUD—*Deed—Cancellation—Case at bar.*—On the evidence disclosed by the record and the defendant's answer: *held,* there was no fraud, and deed must stand.

Appeal from decree of circuit court of Northumberland county, rendered October 2d, 1888, in a suit wherein Miss M. J. Fallin was complainant, and W. J. Tune was defendant. The bill in this case was filed by the appellee to set aside her deed to the appellant to a tract of land in the county of Northumberland, executed December 20th, 1887, for the sum of $2,400, upon the ground of misrepresentation, collusion, and fraud; and on the 2d day of October, 1888, the circuit court of said county rendered a decree declaring the said deed null and void for the reasons stated, and the appellant, the purchaser, appealed to this court.

*John Critcher,* for the appellant.

*W. A. Jones,* for the appellee.

LACY, J., delivered the opinion of the court.

The claim of the bill is that the plaintiff, a maiden lady of full age, executed the deed in question, and left it in the pos-

session of her counsel, with the understanding that it was not to be delivered to the defendant, Tune, until she consented thereto; that she never did so consent; that her said counsel nevertheless did deliver it immediately—almost upon its execution—and the entire purchase-money receipted for, when the said counsel was not authorized to receive the purchase-money, of which the purchaser had notice, and that the purchaser had agreed that, if she could sell on better terms to another person, she could do so, whereas now the said deed was falsely claimed to be final and concluded, and that the said purchaser had instituted an action at law for the possession of the said premises, which are in the possession of her brother and mother, and that the said deed should be vacated and set aside, and an injunction awarded to restrain the prosecution of the action at law.

The answer of the defendant denied these allegations of the bill, and declared the contract to be fair, conclusive, and definite, the cash payment paid, and the negotiable notes executed and duly delivered. The counsel was not a party, and did not answer the bill, but his deposition was taken, and he also denies the allegations of the bill.

The fraud charged in the bill, and denied in the answer, must be proved by the plaintiff. It is by her that the charge is made, and it is upon her to prove it.

This court has been called upon, in other cases, to consider similar charges of fraud, and it is always necessary to prove fraud, not always by direct and positive evidence; circumstantial evidence is not only sufficient, but, in most cases, it is the only proof that can be adduced, and, while the court will be just to the rights of the person charged with fraud, and cautious not to lend too ready an ear to the charge, the question must be justly and fairly considered, with due regard to the rights of all parties.

If the charges made in the bill can be established by legal evidence, upon such proof it is the province of a court of

equity to relieve against such fraudulent practices. But we
will consider this question upon the proofs alone. Charges of
fraud, unsupported by proof, are but empty air, amounting to
nothing.

This suit is against the defendant, W. I. Tune, and the fraud
must be such fraud as was committed by him, either directly
or indirectly; for, of course, if he has gained an advantage
by the fraud of another practiced in his interest, in conscience
he must surrender it.

The deposition of the plaintiff, a maiden lady of full age,
sustains the allegations of the bill in the main, and denies the
delivery of the deed. The deposition of the defendant dis-
tinctly denies the allegations of the bill as to the fraud, and
sets forth the delivery of the deed in question in the office of
J. J. Darlington, a lawyer in Washington city. These two
parties being thus in conflict, we turn, for the present, from
the unpleasant task of weighing their depositions upon the
question of probability, and consider the deposition of Mr.
Darlington, who is disinterested. He says:

"I am a member of the bar (of the supreme court bar) of
the District of Columbia; reside in the city of Washington.
Some months ago—I presume on January 31st, 1888, from the
date of the envelope which I hold in my hand—Mr. William
I. Tune, who is a client of mine, and Judge Critcher, who rep-
resented Miss J. M. Fallin, as I understand it, called at my
office together, and stated that Mr. Tune had purchased a
farm from Miss Fallin; that the title to the farm was clouded
by an attachment suit brought against Miss Fallin by some
relative—I think her uncle—and that it had been agreed that
certain notes of Mr. Tune to the order of Miss Fallin, repre-
senting the deferred purchase-money of the farm, should be
left in escrow with them until the attachment could be gotten
rid of. My best recollection is that they also had with them
a deed from Miss Fallin to Mr. Tune, which was delivered to
him at my office, if I remember correctly, with an authority

to record it. The notes were then placed in an envelope, upon which, upon my request, Judge Critcher, as the attorney of Miss Fallin, endorsed a memorandum of the conditions upon which I held it. The endorsement was made, and set forth the notes, amounts, dates, &c., and the following was added : " On this day placed in the hands of J. J. Darlington in *escrow*, to be delivered to J. M. Fallin upon the discharge of the attachment sued out against her in Northumberland county by J. H. Fallin—January 31st, 1888."

Mr. Darlington does not state that Miss Fallin was present, but the deposition of the witness Sholes, taken the same day, who was a law student in the said office, proves that she was present. He says: "I was present during the transaction between Mr. Tune and Miss Fallin. There were present at that time *Mr. Tune and Miss Fallin*, Judge Critcher, and Mr. Darlington a part of the time, and myself;" that he heard no complaint from Miss Fallin, but that he paid no attention to the details, not being interested.

Judge Critcher, the counsel for Miss Fallin, says in his deposition that Miss Fallin, after the partition of the land (between herself and brother), desired him to sell her share of the land—that she derived no benefit of any consequence from it; that at her request he went to the counties of Westmoreland and Northumberland to offer this land to persons suggested by her, but he found them more anxious to sell what land they had than to buy any; that Miss Fallin found the purchaser, Tune, in Washington, herself, and caused him to come to Judge Critcher's office on this business, and his uncle came with him, and after much negotiation the contract was concluded; that every step in the transaction was explained to her, and that he prepared the papers and sent them to her for examination and approval; that she examined, approved, signed them, and returned them to his office; that he then gave them to Mr. Tune for examination and approval; that after keeping them for some time, he approved and

returned them; that the parties met by agreement at Mr. Darlington's office, and the deed was delivered to Tune, and the trust deed securing the notes for the deferred payments was delivered to Miss Fallin, and the notes left with Mr. Darlington as described; that Tune sent the deed and the trust deed to the clerk for recordation, and the cash payment, left on the desk by Mr. Tune, was given to him by Miss Fallin after his request to her to take out what she wished to use; and that there was no dissatisfaction on the part of Miss Fallin that he heard of until agonizing letters came from her mother about giving up her home, which belonged to Miss Fallin under the partition, and upon which the mother and the brother resided; that after she had completed the purchase, and her change of mind after receiving letters from her mother, he expressed the opinion that Mr. Tune would re-sell for a small advance of five per cent.; that he based this opinion upon the reluctance Mr. Tune had manifested to buy, and the general decline of land in that country. As to the meeting in Mr. Darlington's office, on cross-examination, Miss Fallin admits that she was then and there present, January 31st, 1888, and that Mr. Tune did execute the trust deed and notes that day, and that he did put some money on the desk that day, *but that she told them that she would have nothing to do with it,* but that Judge Critcher did give her a receipt for $200, *which she took, as she did not know what to do about it;* and she elsewhere says that Judge Critcher made her sign the deed, and told her Mr. Tune knew all about the papers. But Tune did not know all about the papers, but took them for inspection, and Judge Critcher said that was all right. Mr. Tune declares that at the beginning of these negotiations he had no acquaintance with Judge Critcher, who was brought to his attention by Miss Fallin.

The evidence upon the whole shows the case of a lady who, growing weary with the privations attendant upon her life in the country upon the farm with her mother and brother, one-

half being owned by her and half by the brother, subject to an annuity for life to the mother of $100, or $50 for each, and who, becoming dissatisfied with the little clear residue left from the results of the farm operations, after providing the necessaries of life for the family, and paying the annuity in whole or in part, sought successfully an assertion of her rights and her independence by an enforced partition of the farm, which, she declared, she was unable to procure through local counsel through local influences; that, having taken this step forward in the assertion of her rights as a *feme sole*, she sought the protection and assistance of an acquaintance, relative and friend at Washington, in the person of the lawyer who had aided her in the first successful assertion of her rights, sought and obtained employment in Washington city, and set on foot energetic efforts to sell her land in Virginia, and put the proceeds into interest-bearing funds, while she supported herself for the present in her employment; that in the person of the defendant, Tune (the appellant here), she sought and found a purchaser for her land; that she went forward resolutely in this purpose of a sale, seeking to sell, offering to sell, without success; to J. H. Fallin, a subsequent bidder; that during all this time she seems to have been either let alone, or at least not influenced from home; that making the sale, and 'the deed brought upon the scene at home, the relatives sought to avert what seems to be regarded by them as a calamity, and set on foot agencies which were very influential in the form of a mother's entreaties, which, if employed earlier, would, apparently, have been sufficiently effective. The first effect of these remonstrances and entreaties from the near relatives at home, whom she had so lately left with feelings of discontent at least, was to cause her to forget all her past grievance, real or fancied, and *desire* to retrace her steps. She began by *soliciting* her attorney and her former friend, Tune, to get a release, upon a proposition to buy at $3,000 from J. H. Fallin, who had before refused to buy. Her counsel was again ready to

aid her, and she made a *request,* not a *demand,* on Tune to release her that she might get more, which she seemed eagerly to believe was open to her. But failing in this amicable endeavor, she set on these demands for her alleged legal rights. *Her claim is* that, while the purchaser paid the cash payment, and executed negotiable notes, and placed them where she could get them when a certain claim against her was disposed of, and received a deed, and gave a trust deed to secure the deferred payments, made on long time at her request, that she might change an unprofitable farm into an interest-bearing fund—that the purchaser agreed that all this should be for nought if she could get anybody to give her a small advance of five per cent.

If this were true, it would present a very unusual transaction between buyer and seller, and such a claim, when denied by the purchaser and contradicted by all the papers, solemnly signed by herself, certainly would require clear proof. What is the proof offered? Her own claim that she so understood all the transactions contrary to what was actually done.

On the other hand stand the solemn deeds, and the payment to her and receipt of money by her, and earnest denials on oath by the purchaser, who, like herself, has gone on the stand and submitted himself to cross-examination, and the depositions of Tune's counsel, her own counsel, and a disinterested by-stander.

Can she be said to have proved her case? I think not. There is a great deal of asseveration; but where is the proof? The case is altogether different from the case of *Moore* v. *Ulman,* 80 Va., 307, and the cases there cited.

While we can sympathize with her, and the discomfort she has brought home to her mother and her brother, if Tune stand upon his legal rights, must he not be allowed them? If all the charges brought by her against her attorney, of infidelity, were sustained by proof, which they certainly are not, yet he was her counsel, and acted for her, at her procurement;

he was held out by her as her representative and lawyer. He was not Tune's lawyer nor Tune's agent. I do not see any sufficient ground to sustain the decree of the circuit court, which appears to be plainly erroneous, and which must be reversed and annulled, and such decree rendered here as the said circuit court ought to have rendered, and her bill dismissed.

DECREE REVERSED.